KING, C.J.,
for the Court:
¶ 1. A long-time employee who was injured at her place of employment as a nurse at a nursing home in Ripley, Mississippi, was denied workers’ compensation benefits by the Mississippi Workers’ Compensation Commission in a split decision. However on appeal, the circuit court reversed the Commission’s decision and reinstated the decision of the administrative judge (AJ) awarding Irene Hare temporary total benefits until she reaches maximum medical improvement. The employer and carrier appeal raising two issues, which we combine as one: whether the circuit court erred by re-weighing the evidence and substituting its own findings of fact for those of the Commission by finding that the employee sustained a compensa-ble work injury. We find that the circuit court was correct in reversing the decision of the Commission. Accordingly, we affirm the judgment of the circuit court to reverse the Commission’s decision as unsupported by substantial evidence. We remand this case to the Commission to determine Hare’s benefits.
FACTS
¶ 2. Hare, who was seventy-four years old, had suffered several accidental injuries to her left leg.

1. Work History

¶ 3. After being widowed, Hare went back to school at age forty-eight to become a licensed practical nurse. Prior to her nursing career, Hare had worked as a truck driver, a painter, a shoe packer at Brown Shoes, and a beautician. After becoming an LPN, she worked for Timber Hills Nursing Home and also part time on weekends at Whitfield Nursing Home in Carthage, Mississippi, some 160 miles from her home in Booneville, Mississippi. She began working for Beverly Enterprises in Iuka, Mississippi, in 1985 and later transferred to a Beverly owned nursing home in Ripley where she has worked since. She was off from work 1988-1991, recovering from a broken left leg she received as the result of slipping on ice. Her average weekly wage at the time of her injury was $710.40.
¶ 4. At Beverly Healthcare, Hare always worked the second shift from 2:45 p.m. until 11:15 p.m. with a thirty-minute lunch break. The facility had two wings, A and B, with a nurses’ station in the middle. Hare was responsible for Wing B, which had sixteen rooms and twenty-eight patients. Her duties included passing out medications twice during her shift, charting information, refilling ice and water containers in patient rooms, and helping the certified nursing aides when needed. Hare testified that she willingly worked extra hours when other workers were out. She testified that she was supposed to work four days a week, but if anyone was out, she would come in and work. On April 25, 2005, the day of the accident, which is at the heart of her workers’ compensation claim, Hare was working her sixth consecutive day.

2. Left-Leg Injuries

¶ 5. Hare’s trouble with her left leg began in 1964 when she and her mother were involved in an automobile collision in which their vehicle was hit head on by a drunk driver. Her mother perished in the accident, and Hare’s left ankle and knee were crushed along with other serious injuries. Hare testified that after the accident, she consistently walked with a limp.
¶ 6. In 1987, Hare was involved in another serious automobile accident in which *226 her left knee and ankle sustained crush injuries. At some point her leg injuries required that a super condylar screw and side plate be implanted into her left femur. This was done at a hospital in Tupelo, Mississippi. Still having severe pain, Hare went to an orthopedic surgeon in Memphis, Tennessee, who removed her kneecap. It was at this time that she began being seen by Dr. Charles Taylor, an orthopedic surgeon, in Memphis.
¶ 7. According to Hare, at some point prior to 1987, she had suffered a stress fracture of her foot while walking down the hall at the nursing home. She said Dr. Taylor placed her leg in a cast, which she wore for six weeks at work. While this injury occurred on the job, Hare never filed a claim for workers’ compensation benefits. In 1993, Dr. Taylor surgically removed the implanted devise in Hare’s leg, which had failed. After removing the device, Dr. Taylor inserted a locked nail in her left femur and grafted bone in the area. Dr. Taylor testified that she made a full recovery from this surgery. The next year, Hare slipped on some ice and broke her femur above the knee. In 2000, she stepped awkwardly off a curb and fell breaking her pelvis. Despite these previous injuries, the testimony is uncontradicted that Hare had passed Beverly’s physical examination every year. It is uncontradicted that on the date of the injury Hare had been cleared by her doctors to return to work.

3. The April 25, 2005, Injury to the Left-Leg

¶ 8. According to Hare, on April 25, 2005, her knee was hurting more than usual, and she told her fellow employees that she planned to go to the emergency room after her shift had ended and get a shot for the arthritis pain in her left leg.
¶ 9. After clocking in, Hare sorted the medications for the patients on her wing and got ice and water for them to take with their medications. Hare gave medications twice, first at the beginning of her shift and again at 8:00 p.m. After assembling the medications, Hare who had been a smoker since age fourteen took a smoke break. According to Hare, Dr. Taylor had warned her that one of the hazards of smoking is that it impedes the healing of fractures. After her smoke break, Hare gave the medications to the patients; this took approximately two and a half hours. She then went back up to the nurse’s station and did her charting and weekly summaries. She said she also performed a treatment or two on patients, by which she meant dressing a small cut or re-bandaging a cut. Hare took her lunch break at approximately 5:00 p.m., and when she returned, she went to the computer to do charting. After that she began giving the second round of medications. The giving of the medications involved taking the medication from a cart and giving it to the patient along with a glass of water. Starting at the end away from the nurse’s station, she rotated from side to side giving the medications. Hare had worked her way up to room number nine. She said she retrieved the medication for the patient and poured out a glass of water and headed into the room. When she reached the end of the cart she remembered that she had forgotten to get the glass of water off the cart, so she “pivoted around” on her left leg to pick up the glass. She said that as she pivoted, her leg just “popped just like a shotgun,” and immediately, she was in terrific pain. She realized that her leg was broken and called for the aide to go get the LPN in Wing A. Unable to walk, she held herself up on the medicine cart until one of the aides put a chair underneath her and the other LPN called for an ambulance.
*227 ¶ 10. The aide, Neda Kirk, who had worked with Hare for more than fifteen years, said that she was in a patient’s room when she heard Hare screaming in pain. Hare instructed her to go get the LPN on Wing A, Megan Pannell, which she did. Kirk testified that Hare was “pretty much screaming” most of the time from the time of the injury to the time the ambulance came. Pannell was called by the employer and earner to testify. She remembered that Hare was walking with a more pronounced limp on the day of the injury. She testified that on that day she rew-rapped Hare’s Ace bandage but that it was located on her left thigh and not her left knee, and there was nothing wrong with the leg. Hare said that she did not recall anyone adjusting her bandage. Pannell said that she observed Hare using a walker to go outside for her smoke break; a fact that Hare also denied. Pannell was also taking a smoke break, and she said she asked Hare if she was going to be able to make it through her shift; Hare replied that she was fine. Pannell said she had never seen Hare using a walker before. Pannell said after being summoned to help Hare, she found her in the hallway in a chair with her leg extended, and she could see a bulge in Hare’s left thigh area that she thought was a fracture.
¶ 11. Hare was taken by ambulance to the emergency room at Tippah County Hospital, but she was then transferred to St. Francis Hospital in Memphis. An x-ray showed that she suffered a transverse fracture to her left femur. Hare underwent an open reduction and internal fixation of the fracture on April 25, 2005. In January 2006, Dr. Taylor removed the screws from the left leg with revision and bone grafting and removed a screw on March 28, 2006. Hare has continued seeing Dr. Taylor for followup care.
A Testimony of Dr. Charles Taylor, the Treating Physician
¶ 12. Dr. Taylor, an orthopedic surgeon, had been seeing Hare since 1998. Dr. Taylor testified that Hare had completely healed from a past patellar fracture and distal fracture in her left femur by the time of the April 25 event. Additionally, Dr. Taylor testified that the April 25, 2005, injury was to a different level of her thigh than her original fracture level, approximately two inches away from the previous injury, and it occurred in a screw hole that was used on a plate applied in Tupelo during a previous surgery. He testified that her 2005 fracture “was at a level further up the shaft ... well away from her original fracture.” Dr. Taylor was asked if the earlier injuries had anything to do with or in any way contributed to the April 25, 2005, injury; and he responded that it did not. Dr. Taylor testified that the fracture was the result of a twisting injury.

5. Testimony of Expert Witness for Employer and Carrier, Dr. Guy T. Vise Jr.

¶ 13. The employer and carrier hired Dr. Guy T. Vise Jr., an orthopedic surgeon from Jackson, Mississippi, to review Hare’s medical records and give an opinion. Dr. Vise did not examine Hare; he arrived at his opinions by only examining her medical file. Dr. Vise said he no longer performs surgery but spends about half of his time as a professional expert witness. He testified at his April 4, 2007, deposition that his hourly rate was $600 an hour for a consultation and $750 an hour if he had to testify in court, and he charges a separate fee for depositions of $900 with a two-hour guaranteed minimum. His conclusion was that Hare’s fracture was caused from diseased bone that had been hurt again. Dr. Vise testified that he *228 thought that Hare had significant weakness from her numerous surgeries that caused her to be susceptible to what he called a “spontaneous fragility fracture.” He said it takes 150 days for normal bone to heal and nine months or so for the normal bone to heal in a smoker. He said that the fracture could have occurred at any time when she was doing so-called “normal activities of life,” but it just happened to occur while she was performing her job at the nursing home. Dr. Vise was asked if he agreed with Hare’s doctor, Dr. Taylor, that the injury Hare sustained on April 25 was a torsion fracture caused from the twisting of the bone. Dr. Vise agreed that the medical records were consistent with Hare’s injury being caused by a twisting or torsion of the bone.

6. AJ’s Order

¶ 14. The AJ on June 29, 2007, found that Hare had met her burden of proving that her fracture to the left femur on April 25, 2005, was work related. The AJ found:
She was working that night for the Employer, performing her normal job duties when she suffered the injury. The testimony was consistent that Claimant was handling her work duties that night when she was injured. Although Claimant had prior surgeries and osteoporosis, she had been working regular duty for the Employer for years without assistance. Her treating physician, Dr. Charles Taylor, characterized her fracture as “new.” Even if the fracture occurred spontaneously, Claimant was still injured while performing her work duties. Therefore, I find that Claimant’s left femur fracture was work related in accord with the Mississippi Workers’ Compensation Law.
¶ 15. The AJ awarded Hare temporary total benefits until she reaches maximum medical improvement, which the parties agreed would be calculated once the com-pensability issue was resolved.

7. The Commission’s Decision

¶ 16. The employer and carrier appealed to the Commission, which on a vote of 2-1 found that the AJ’s order was contrary to the overwhelming weight of the evidence and was not supported by substantial evidence. The Commission held that while it is undisputed that Hare suffered a left-femur fracture while at work on April 25, 2005, Hare had failed to establish that her injury arose out of her employment. The Commission ruled that Hare had failed to establish any causal nexus between her work activities and her left-femoral fracture. “[Sjimply being at work when an injury occurs does not meet this nexus.... There is no evidence in the record which discloses any untoward event, unusual occurrence, accident or injury incident to Claimant’s employment. It is the Claimant’s testimony that she was simply walking or pivoting to enter a patient’s room when she felt her left leg pop.” The Commission reversed the order of the AJ. However, one commissioner dissented finding that Hare had sustained a compensable injury “when she broke her left femur while conducting the duties of her job as a Licensed Practical Nurse.”
¶ 17. Hare appealed the Commission’s decision to the Circuit Court of Tippah County. After hearing oral argument, the circuit judge ruled from the bench that the Commission’s order was not supported by substantial evidence. The circuit judge noted that his usual practice was to review the record again after argument and then issue his decision. However, he said this appeal was the exception. The circuit judge acknowledged that he was obligated to apply a limited standard of review to workers’ compensation decisions and noted that he had never reversed a decision be *229 fore. Expressing bewilderment with the Commission’s decision, the circuit judge stated:
I am not only of the opinion that the relevant findings of the two Commissioners are not supported by substantial evidence, I am quite surprised at the finding[s] of the Commission, quite frankly. I mean I understand how they came up with the result they came up with. I understand how they used words to achieve a result. I find this to completely contravene[ ] the purpose and intent of the [A]ct.”
ANALYSIS
¶ 18. We begin our analysis by noting our limited standard of review in workers’ compensation appeals. The Commission is the trier and finder of facts in a compensation case. Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1245-47 (Miss.1991). This Court will overturn the Commission’s decision only for an error of law or an unsupported finding of fact. Georgia Pac. Corp. v. Taplin, 586 So.2d 823, 826 (Miss.1991). Reversal is proper only when a Commission’s decision is not based on substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law. Smith v. Jackson Constr. Co., 607 So.2d 1119, 1124 (Miss.1992). “We will reverse when the findings of the Commission are based on a mere scintilla of evidence that goes against the overwhelming weight of evidence.” DiGrazia v. Park Place Entm’t, 914 So.2d 1232, 1236 (¶ 8) (Miss.Ct.App.2005) (citing Johnson v. Ferguson, 435 So.2d 1191, 1194-95 (Miss.1983)). In Myles v. Rockwell, Int’l, 445 So.2d 528, 536 (Miss.1983), the supreme court found that when the decision of the Commission is clearly erroneous and adverse to the overwhelming weight of the evidence so that the Commission’s decision fails to carry out the beneficent intent and purpose of the Workers’ Compensation Act, this Court must reverse the decision of the Commission.
¶ 19. In their appellate brief, the employer and carrier claim that an erroneous standard of review was used by the circuit court. They claim that rather than limiting its review to a determination of whether there was substantial evidence to support the Commission’s decision, the circuit court reweighed the evidence presented to the Commission and then substituted its findings for those of the Commission. The employer and carrier then devote several pages of their appellants’ brief pointing out how the circuit court was wrong in its conclusions.
¶ 20. In our decision in Ameristar Casino-Vicksburg v. Rawls, 2 So.3d 675, 680 (¶ 17) (Miss.Ct.App.2008) (citing Posey v. United Methodist Senior Servs., 773 So.2d 976, 978 (¶ 5) (Miss.Ct.App.2000)), we said that even though the appeal is technically from the circuit court, our task upon appeal is to review the Commission’s decision for validity. That we shall do.
¶ 21. The employer and carrier argue that the Commission was correct when it decided that Hare’s April 25, 2005, femoral fracture was not the result of any untoward event, unusual occurrence, accident, or injury incident to her employment; and they further argue that there was no medical proof of causation between her work and her fracture.
¶ 22. The Commission found that Hare’s injury failed to meet the statutory definition of injury as found in Mississippi Code Annotated section 71-3-3(b) (Rev. 2000). That statute provides in pertinent part:
“Injury” means accidental injury or accidental death arising out of and in the course of employment without regard to fault which results from an untoward *230 event or events, if contributed to or aggravated or accelerated by the employment in a significant manner. Untoward event includes events causing unexpected results. An untoward event or events shall not be presumed to have arisen out of and in the course of employment. ...
Miss.Code Ann. § 71 — 3—3(b). Specifically, the split Commission decision found that Hare had failed to prove that any “untoward event or events” occurred during her work that would give the degree of causation necessary to find there was a causal connection between her work and the injury. Instead, the Commission relied heavily on the opinion of the employer and carrier’s expert witness, Dr. Vise, who characterized Hare’s injury as a “spontaneous fracture.” The Commission found that Hare had failed to present substantial and credible evidence of any accidental injury arising out of her employment, stating:
“Instead, the evidence shows that Claimant’s femur fracture was a natural progression of her 40-year history of injuries and surgeries on her left leg, and merely occurred during the course of her employment.”
Further, the Commission found that Hare could not benefit from the “increased-risk doctrine” which provides that an injury is compensable if the conditions of employment increase the risk of injury, even though the primary cause of injury has no causal connection with the work. The Commission found there was no testimony that Hare was placed by the employer in a position of increased risk.
¶ 23. The dissenting commissioner found that Hare sustained a compensable injury when she broke her left femur while conducting the duties of her job as an LPN. The dissenter found that an untoward event occurred at work. In making this finding, the dissent said the following factors had a bearing on his decision: (1) Hare reported to work without a broken leg; (2) Hare was at work when the injury occurred; (3) Hare was performing her duties as an LPN at the time her femur was broken; and (4) her treating physician, Dr. Taylor, described her injury as a torsion injury suggesting that it was the result of a twisting or turning motion. This would be in agreement with Hare’s testimony that she experienced the injury when she pivoted back to her cart to retrieve water for dispensing medication to a patient of the nursing home. The dissenter further found that Hare’s pivot on her leg, which resulted in the transverse fracture, was an untoward event which was accelerated by her employment and caused the unexpected event.
¶ 24. Just as did the circuit court, this Court finds the Commission was mistaken when it denied Hare compensation because that decision was not supported by substantial evidence, and the applicable law was not applied.
¶ 25. In order to establish a prima facie case of disability, a claimant must show by a fair preponderance of the evidence (1) an accidental injury; (2) arising out of and in the course of employment; and (3) a causal connection between the injury and the claimed disability. Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 13 (Miss.1994) (quoting Hardin’s Bakeries v. Dependent of Harrell, 566 So.2d 1261, 1264 (Miss.1990)). An injury arises out of the employment when there is some causal connection between the employment and the injury. Id. at 14. “Injury or death arises out of and in the course of employment even when the employment merely aggravates, accelerates, or contributes to the injury.” Id. at 13-14 (quoting Dependents of Chapman v. Hanson Scale Co., 495 So.2d 1357, 1360 (Miss.1986)). Thus, a *231 claimant is entitled to benefits if the employment acts upon the claimant’s preexisting condition to produce disability. Id. Once a claimant establishes a prima facie case of disability, the burden of proof shifts to the employer to rebut or refute claimant’s evidence. Thompson v. Wells-Lamont Corp., 362 So.2d 638, 641 (Miss.1978).
¶ 26. Turning to an evaluation of the requirement for compensation of an accidental injury that arose out of her employment, we find the evidence is undisputed that Hare’s fractured femur was accidental within the statutory meaning of that term. When Hare reported to work on the day of the injury she was limping; however, she was by no means injured. The testimony was that since her grievous car accident in 1964, Hare has walked with a limp, including the seventeen years she had worked for Beverly. Though the limp was more pronounced on the day of the accident and Hare wore an Ace bandage on her leg, there was no testimony that she suffered the injury away from the workplace. In fact the employer and carrier’s own witness, Pannell, the other LPN on duty on Wing A, testified that Hare’s limp was more pronounced on the date of the injury and that Hare had an Ace bandage on her left upper thigh.
¶ 27. It is undisputed that the fracture of Hare’s leg occurred while she was performing her assigned duties as an LPN at the nursing home. Hare testified that she was delivering medications to the patients when she stopped in front of room nine. As usual she poured out a glass of water, picked up the medication, and headed for the room only to discover that she had forgotten the glass of water. According to Hare, she pivoted around on her left leg to retrieve the water; at which point, her leg popped making a sound like a shotgun, putting her down. Her treating physician of several years, Dr. Taylor, an orthopedic surgeon, testified that the fracture occurred from a twisting injury. He stated that the 2005 fracture “was at a level further up the shaft ... well away from her original fracture.” When he was asked if the earlier injuries to her left leg contributed to the 2005 fracture, he replied that they did not. Likewise, the employer and carrier’s expert witness, Dr. Vise, confirmed that Hare’s injury was consistent with a twisting or torsion fracture. Dr. Vise’s testimony was that Hare’s fracture was a “spontaneous fragility fracture,” which could have occurred at any time when she was doing so-called “normal daily activities” because of her past history of numerous surgeries to the left leg. The record is clear and without contradiction that Hare was in the process of performing the normal daily activity of working at her long-held job as an LPN when she suffered a severe femur fracture.
¶ 28. The final requirement for compensation is a causal connection between the injury and the job. One noted treatise has aptly described the concept as follows:
A worker sustains an accidental injury if, when looking through the eyes of the worker, there is harm to the worker from work-connected activity that either: (a) was from an unexpected event; or (b) was an unexpected result. The unexpectedness of either the event or the result is accidental.
John R. Bradley and Linda R. Thompson, Mississippi Workers’ Compensation § 3:1 (Thompson-West 2008).
¶ 29. When applying this definition to the facts of this case, it is readily seen that looking through the eyes of Hare, her fractured femur was an unexpected result of dispensing medications to her patients. Hare testified that this portion of her job involved twice a day placing medications, water, and glasses on a cart and starting *232 at the end of the hallway working her way toward the desk dispensing the prescribed medication along with a glass of water to each patient. She was doing this job in the usual way when she pivoted to get a water glass and her femur fractured making an unexpected sound like a shotgun blast.
¶ 30. Thus, we find that the Commission did not have substantial evidence to support its denial of compensation to Hare. In fact, we find that she sustained her burden of proving compensability by substantial evidence.
¶ 31. Two other points of law were not applied by the Commission in arriving at its decision. The first is that the employer takes the worker as the worker is found, that is, with all the physical strengths and weaknesses the worker brings to the job. Hanson Scale Co., 495 So.2d at 1360. Two examples used in Hanson Scale in applying this rule are on point with the case at hand:
If a lame worker suffers an employment fall and is injured, the injury is said to arise out of and in the course of employment under the same test applied for workers not lame. By the same token, if an awkward worker stumbles and falls, the rule is the same as if the worker were agile.

Id.

¶ 32. Hare has worked her entire adult life and has suffered more injuries than most to her left leg. Only once when she fell on ice did the injuries keep her out of the workforce. After one fall and injury she worked for six weeks in a cast for Beverly and did not file for workers’ compensation benefits. Her continued injuries did not stop her from working, nor did they stop the employer Beverly, from ben-efitting from her work and loyalty. On the day of the accident, Hare was working the sixth day in a row. She testified that she was supposed to work four days a week, but she would work if anyone was out. Thus, Beverly accepted Hare with her weakened bone structure along with her undoubted strengths as an LPN in its facility. The Commission erred by not considering this point of law in connection with Hare’s claim.
¶ 33. The second point of law not considered by the Commission is the remedial nature of the workers’ compensation statutes and the broad interpretation it is to be given. In Big “2” Engine Rebuilders v. Freeman, 379 So.2d 888, 889-890 (Miss.1980), the Mississippi Supreme Court summarized:
The singular purpose pervading the Workmen’s Compensation Act is to promote the welfare of laborers within the state. Miss.Code Ann. § 71-3-1 (1972); Nowlin v. Lee, 203 So.2d 493 (Miss.1967). As remedial legislation to compensate and make whole, McCluskey v. Thompson, 363 So.2d 256 (Miss.1978) [receded from on another issue], it should be construed fairly to further its humanitarian aims. Speed Mechanical, Inc. v. Taylor, 342 So.2d 317 (Miss.1977); L.B. Priester & Son, Inc. v. Dependents of Bynum, 244 Miss. 185, 197-98, 142 So.2d 30 (1962). Doubtful cases must be compensated. Evans v. Continental Grain Co., 372 So.2d 265 (Miss.1979); King v. Westinghouse Electric Corp., 229 Miss. 830, 92 So.2d 209 (1957); Lindsey v. Ingalls Shipbuilding Corp., 219 Miss. 437, 68 So.2d 872 (1954); National Surety Corp. v. Kemp, 217 Miss. 537, 64 So.2d 723 (1953), Deemer Lumber Co. v. Hamilton, 211 Miss. 673, 52 So.2d 634 (1951); see also Dunn, Mississippi Workmen’s Compensation §§ 31-32 (2d Ed.1967).
In no way do we find that Hare’s is a doubtful case. However, the Commission *233 erred by not fairly construing the humanitarian aims of the statute and its remedial nature to compensate and make the injured worker whole.
¶ 34. In conclusion, we find that the Commission’s decision is clearly erroneous and in contradiction to the overwhelming weight of the evidence which supports compensation to Hare. Further, the Commission failed to correctly apply the law. Therefore, we affirm the judgment of the circuit court, which reversed the Commission’s decision and reinstated the AJ’s order. We remand to the Commission to determine Hare’s benefits.
¶ 35. THE JUDGMENT OF THE CIRCUIT COURT OF TIPPAH COUNTY IS AFFIRMED, AND THIS CASE IS REMANDED TO THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION TO DETERMINE IRENE HARE’S BENEFITS. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE AND MYERS, P JJ., BARNES, ISHEE AND CARLTON, JJ., CONCUR. ROBERTS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J. IRVING AND MAXWELL, JJ., NOT PARTICIPATING.