IRVING, P.J.,
dissenting:
¶45. I cannot agree that the circuit court did not err in granting summary judgment in favor of the appellees, because it appears rather clear to me that a proper and thorough examination of the facts presented shows the existence of a genuine issue of material fact with respect to whether the appellees had an arguable basis for denying Thomas’s claim. , Therefore, I dissent. To put into prospective why it is clear to me that summary judgment was improperly granted, I must cite extensively the facts, which show — contrary to the majority’s view — that the ap-pellees did not conduct any significant investigation until after. Thomas filed his petition to controvert, which was over a year after his work-related injury.
¶46. On June 4, 2001, Thomas was building a display at the Jitney Jungle store in Bay Springs while working as a route salesman for Coke. As he attempted to pick up soft drinks to place in the display, he heard his back “pop,” and he collapsed. Several individuals witnessed the incident, including the manager on duty at the Jitney Jungle. Thomas called Coke’s plant manager, Willie Meador, and Willie instructed him to go to ORA for evaluation and treatment. Thomas followed Willie’s instructions and went to ORA, where he saw Dr. Coleman. Dr. Coleman prescribed epidural-steroid injections and physical therapy at Southeastern Regional Medical Center, and continued Thomas on muscle relaxers that Thomas was taking due to a prior injury. Dr. Coleman eventually referred Thomas to Dr. Lee, and Thomas first visited Dr. Lee on July 14, 2001.
¶ 47. Prior to the June 4, 2001 incident, according to the record, Thomas injured his lower back in 1991, while working in the scope of his employment with Coke. He had been taking daily prescription medication, Flexiril, for his back pain since the 1991 incident. Thomas was also in a rollover accident in August 2000 while on vacation and, according to his affidavit, missed a day of work. ' After the June 4, 2001 Jitney Jungle incident, Thomas returned to work and was placed on light duty. However, despite being placed on light duty, he was unable to perform his assignments without help from other employees.
¶ 48. Tammy Saul, án administrator at Coke, submitted an “Employer’s First Report of Injury or Occupation Disease” form on June 6, 2001. On June 11, 2001, Saul told the Southeastern Medical Center that Thomas’s physical therapy[1] was covered under workers’ compensation. A few days later, Lloyd Boleware, a Coke supervisor, approved payment of the steroid injections *686 under Coke’s workers’ compensation insurance. On June 24, 2001, Coke noted in Thomas’s file that his employment status had changed, effective June 19, 2001, to a new status of “Workers’ Compensation.”[2]
¶49.' In a letter dated June 26, 2001, ORA reported to Coke:
The doctors of our clinic have all reviewed the chart of Mr. Thomas Chapman and are all in agreement that Mr. Chapman’s condition is not work-related but it is aggravated by work We have reviewed the MRI done by our clinic and reviewed the MRI that was done previously. We feel that all of his injuries are from previous accidents and no new injury was noted. We also agree that Mr. Chapman needs to continue to be off work as the condition is not caused by work but aggravated by work.
(Emphasis added). The report was signed by Dr. Ali.
¶ 50. On June 29,, 2001, Redferrin entered notes into Thomas’s electronic claim file, which stated:
Discussed claim with Willie at Coca-Cola in Laurel, Mississippi.... Willie advised [Thomas] rolled a van about .3 times (totaled the van)[;] [Thomas] is .off 3 weeks. The doctor has indicated his condition is not work related but aggravated a pre-existing condition. [Thomas], is currently drawing short term disability thru Coca[-]Cola. Willie will fax the report to me.
(Emphasis added). On August 1, the record reflects that the following note was entered in Thomas’s file:
[Transferred this claim to Adjuster Redferrin for investigation. Make all contacts to determine compensability for all factors. Description of this claim is [that the injured worker] bent over, to pick up an object and felt pop in back. When did [injured worker] have the auto accident? It appears that we have. 2 different incidents. Was the [injured worker] in a company van? Determine what is caused from this on the job injury and what is from the van accident? Which is he losing time from? Document plan of action to move to resolution. Review to verify coding.
On September 17, 2001, according to Red-ferrin’s notes, she closed Thomas’s file.[3]
¶ 51. In the meantime, beginning on July 14, 2001, Dr. Lee treated Thomas at the Southern Neurological Institute. After conservative treatment failed, Dr. Lee performed decompression back, surgery on Thomas, and on March 15, 2002, Dr. Lee found that Thomas had reached maximum medical improvement. Coke did not pay for the services rendered by Dr. Lee.
¶ 52. Between June 11, 2001, which apparently was the date that American Casualty and CNA were notified of Thomas’s injury, and August 2002, American Casualty and CNA did not conduct any serious investigation of Thomas’s injury — they did not even interview Thomas. And even after July - 31, 2002, the date Thomas filed a petition to controvert with the Mississippi Workers’ Compensation Commission (Commission), the appellees did not do any serious investigation-and continued to deny that Thomas was entitled to benefits.- I *687 should note that Coke initially accepted that Thomas’s injury was work related, but changed that position after, receiving ORA’s report on June .26, .2001.
¶ 53. On December 16, 2005,' issues of whether Thomas sustained a work-related injury to his back on June 4, 2001, the existence of temporary disability, and the reasonableness and necessity of medical treatments were brought before an administrative judge (AJ). Both sides presented medical testimony at the hearing. The AJ ruled that the injury was compensable and awarded past-due compensation for temporary total disability from June 6, 2001, through March 15, 2002. The defendants appealed the ruling to the full Commission, which heard the case on July 31, 2006, and affirmed the AJ’s ruling in toto.
¶ 54. A hearing date was set for January 2007 to determine the compensation for permanent disability, but was’ postponed.- In May 2007, the parties agreed to, and the Commission approved, the 9(i) settlement[4] between the parties for $111,000 for Thomas’s claim for permanent loss of wage-earning capacity plus payment of all outstanding medical bills, including bills from Dr. Lee at the Southern Neurological Institute, and from the University Medical Center.
¶ 55. On April 21, 2008, Thomas and Brenda filed, in the circuit court, their original complaint against the appellees.. In the complaint, Thomas and Brenda alleged that Coke, American Casualty, CNA, and ORA had engaged in a conspiracy to deny Thomas workers’ compensation benefits, and had refused payment in bad faith.
¶ 56. In May 2008, the defendants removed the case to the United States District Court for the Southern District of Mississippi. The case remained in the federal district court until August 31, 2011, when it was finally remanded to the circuit court.
¶ 57. After completing discovery, American Casualty and CNA moved for summary judgment, and Coke joined the motion. On September 20, 2013, the circuit court, without stating its reasons, granted summary judgment in favor of all defendants, leading to this appeal.
¶ 58. As I read the majority opinion, it finds that summary judgment was properly granted because (1) between June 4, 2001, and September 17, 2001, all information-' obtained by CNA indicated that' Thomas .had a preexisting condition, which did not require any payments under workers’ compensation; (2) prior to the petition to controvert* American Casualty found Thomas’s injury resulted from the 2000 vehicle rollover accident, or at least'found the source of his injury in dispute; (3) the claim remained in dispute until July 31, 2006, when the Commission ruled in favor of Thomas," and (4) the language attested to by Thomas in the 9(i) lump-sum petition is an acknowledgment by Thomas of the existence of an arguable claim from the date of the injury until May 30, 2007.
¶ 59, With respect, I must say that the majority totally misses, the mark. As to the majority’s first point, I must say that the appellees had only two pieces of information — neither of which was the result of any investigation conducted by the appel-lees. The two pieces of information were ORA’s report and Coke’s assertion that Thomas injury was caused by the 2000 rollover accident, an assertion that enjoys *688 no evidentiary support in the record — either medical or testimonial.
¶ 60. The majority’s second point — that “prior to the petition to controvert, American Casualty found Thomas’s injury resulted from the 2000 vehicle accident, or at least found the source of his injury in dispute” — fares no better than its first point. Again, with respect, I must say this statement is simply false. What is true is that American Casualty simply accepted as true — without any investigation — Coke’s false assertion that Thomas’s injuries resulted from the 2000 rollover accident.
¶ 61: I am not sure what value- the majority attaches to its third point — that the claim remained in dispute until May 30, 2007, when the Commission .ruled in favor of Thomas. However, I reiterate that the Commission did not rule in favor of Thomas until July 31, 2006, which was more than five years after Thomas’s injury and four years after Thomas filed his petition to controvert. Surely the majority is not asserting that a ruling in favor of Thomas somehow proves that the appel-lees had an arguable basis for denying the claim. But whatever significance the majority places on the span of time, it certainly does not explain any justification for not condúcting any investigation during the thirteen months following Thomas’s injury.
¶ 62. Finally, with respect to the majority’s last finding — that the language in the 9(i) lump-sum-settlement petition is an acknowledgment by Thomas that an arguable claim existed until at least May 30, 2007 — is just an erroneous finding with no undergirding in the record. It appears' clear to me that the majority, in making this finding, conflates two different and distinct things: (1) a bona fide, legitimate dispute as to the ñatee and extent of Thomas’s permanent disability for the sole purpose of settling the extent of permanent disability and amount of compensation due, (2) the existence of an arguable basis for denying or refusing to pay the claim altogether. The two are not the same. The dispute with Coke — -which is at the center of Thomas’s bad-faith lawsuit— is not about the nature, extent, or severity of an admittedly work-related injury, but about whether Coke had an arguable basis for denying that Thomas had suffered a work-related injury at all. Therefore, that Thomas attested in the settlement petition to the existence of a bona fide, legitimate dispute between him and Coke as to the nature and extent of his permanent disability, loss of wage-earning capacity, and expenses is of no moment with respect to the ultimate issue — whether Coke had an arguable basis for denying Thomas’s claim. Moreover, the lump-sum-settlement petition was aimed at settling the underlying workers’ compensation claim, not a bad-faith claim that had not yet been brought. While the language in the settlement petition precludes Thomas from seeking additional worker’s compensation benefits, there is nothing precluding Thomas from initiating a separate lawsuit for bad-faith refusal to timely pay the benefits, which is a separate tort claim. Miss. Power & Light Co. v. Cook, 832 So.2d 474, 479 (¶ 8) (Miss.2002).
¶ 63. Additionally, there are two other problems with the majority’s reliance on the lump-sum-settlement petition. First, Coke did'not pay the benefits that Thomas was entitled to until it was forced to do so. Thomas was injured on June 4, 2001. The Commission ruled in Thomas’s favor on July 31, 2006, affirming in toto the decision of the AJ who earlier, in the face of strong opposition from Coke, had ruled in Thomas’s favor. Therefore, for more than five years, Coke refused to pay benefits that were lawfully due Thomas and conducted no s investigation for more than a year. Second, the 9(i) lump-sum-settlement *689 agreement was executed in May 2007, in settlement of Thomas’s claim for permanent disability. So, even if Coke had possessed an arguable basis for denying benefits, it did not have one at the time the agreement was signed by Thomas, because the Commission had already determined that Thomas was entitled to benefits, had awarded him temporary total benefits, and had set a hearing date for a determination of the amount of permanent benefits. Thus, when Thomas signed the settlement petition containing the subject language, he could not have been attesting that Coke possessed an arguable basis for denying benefits, as that was not an issue to be determined in the workers’ compensation proceeding. I now turn to a discussion of why I think the evidence shows the existence of a genuine issue of material fact with respect to whether the appellees had an arguable basis for denying Thomas’s claim.

Is there a genuine issue of material fact as to American Casualty and CNA’s claim of an arguable basis for denying Thomas’s claim?

¶ 64. CNA and American Casualty rely upon the ORA report and the statement made by Willie to suggest they had a legitimate and arguable reason for denying Thomas’s claim after initially finding it compensable. I do not find the ORA report definitive. First, I note that the ORA report states that “no new injury was noted[.]” This assessment of the June 4, 2001 incident is. in direct conflict with what transpired at the Jitney Jungle, as it is undisputed that Thomas heard a “pop” and collapsed, an event witnessed by several people. Thomas was replaced by another employee to finish the job at the Jitney Jungle. Thomas saw Dr. Coleman shortly after the incident, and, according to Thomas, Dr. Coleman confirmed that Thomas had suffered a back injury on June 4, 2001. Thomas was unable to resume his normal work after the incident.
¶ 65. In his nebulously written ORA report, Dr. Ah refers to “accidents” as the basis for Thomas’s condition. The investigation into Thomas’s claim is void of any attempt to speak with Thomas or review Thomas’s medical reports to identify the “accidents” — one of which was the on-the-job accident at Coke in 1991. American Casualty and CNA further rely on Willie’s statement that Thomas’s injuries were all related to the 2000 rollover accident. First, Willie is not a physician. Second, there is no medical evidence to support Willie’s statement diagnosing the cause of Thomas’s condition. Nor can Willie’s statement be reconciled with' the ORA report, which refers to prior accidents, one of which undisputedly was the 1991 work-related accident. Thomas- was finally deposed on March 18, 2008. In his deposition, he affirmed that he initially injured his back in the 1991 accident, which was work related. However, he explained that in the 2000 rollover accident, he did not suffer any injury or aggravation of his 1991 back injury. Despite the findings in the ORA report that Thomas’s condition was related to prior accidents, there is no medical proof that Thomas suffered an injury in the 2000 rollover accident. Therefore, the assessment in the ORA report that Thomas’s condition was related to prior accidents was either made up out of whole cloth or was the adoption of Coke’s erroneous assertion in that regard.
¶ 66. When properly considered, the ORA report at least supports a finding or determination that Thomas’s June 4, 2001 incident aggravated his 1991 work-related injury. An “[ijnjury or death arises out of and in the course of employment even when the employment merely aggravates, accelerates, or contributes to the injury. Thus, a claimant is entitled to benefits if *690 the employment acts upon the claimant’s pre-existing condition to produce disability.” Beverly Healthcare v. Hare, 51 So.3d 223, 230-31 (¶ 25) (Miss.Ct.App.2010) (internal citations omitted).
¶ 67. American Casualty and CNA[5] assert that, based on the facts and information before them, they had legitimate reasons to deny Thomas’s claim. They argue that had they known about the referral to Dr. Lee, they would have deposed him. This seems to be a circular argument. The fact that they did not know of the referral to Dr. Lee is indicative of their failure to investigate. Dr. Coleman, the treating physician provided by Coke, referred Thomas to Dr. Lee. Therefore, CNA and American Casualty could have easily learned of Dr. Lee’s involvement in the case.
¶ 68. American Casualty and CNA were “required to perform a prompt and adequate investigation and make a reasonable, good-faith decision based on that investigation.” Liberty Mut. Ins. Co. v. McKneely, 862 So.2d 530, 534 (¶ 12) (Miss.2003) (citing Bankers Life & Cas. Co. v. Crenshaw, 483 So.2d 254, 276 (Miss.1985)). “Proper investigation ... means obtaining all available medical information relevant to the policyholder’s claim.” Lewis v. Equity Nat’l Life. Ins. Co., 637 So.2d 183, 187 (Miss.1994).
¶ 69. The fact that Thomas was not urging that his medical bills be paid by workers’ compensation for the year following his accident did not relieve American Casualty and CNA of their responsibility to promptly and properly investigate the claim. CNA and American Casualty were aware Thomas was claiming that his June 4, 2001 accident at Jitney Jungle was work related, and they were charged with investigating Thomas’s claim as early as June 2001. Therefore, the fact that Thomas did not file his petition to controvert until July 31, 2002, provides no justification for their failure to investigate the claim for over a year prior to his filing the petition to controvert.
f 70. In order to prevail on a bad-faith claim against American Casualty, the insurer, Thomas must show “that the insurer lacked an arguable or legitimate basis for denying the claim, or that the insurer committed a wil[l]ful or malicious wrong, or acted with gross and reckless disregard for the insured’s right.” McKneely, 862 So.2d at 533 (¶ 9). As to an adjuster, such as CNA, the Mississippi Supreme Court has explained that
an insurance adjuster, agent, or other similar entity may not be held independently hable for simple negligence in connection [with] its work on a claim. Such an entity may be held independently liable for its work on a claim if and only if its acts amount to any one of the following familiar types of- conduct: gross negligence, malice, or reckless disregard for the rights of the insured.
Gallagher Bassett Servs., Inc. v. Jeffcoat, 887 So.2d 777, 784 (¶ 27) (Miss.2004). “Reckless is defined as careless, heedless, inattentive; indifferent to consequences.” Turner v. City of Ruleville, 735 So.2d 226, 228-29 (¶ 10) (Miss.1999) (internal quotations omitted). “For conduct to be ‘reckless’ it must be such as to evince disregard of, or indifference to, consequences.” Id. at 229 (¶ 10).
¶ 71. American Casualty and CNA ceased their investigation in response to Meador’s statement and the ORA report. However, there can be no dispute that *691 Meador’s statement was false in material particulars, and the ORA report did not assert that Thomas was not entitled to any compensation. By obtaining and reviewing Thomas’s- complete medical records; interviewing Thomas, and Thomas’s treating physicians, Drs. Coleman and Lee; and ascertaining the source of Willie’s statement that Thomas's condition was due solely to the rollover accident, the defendants would have learned that there was no arguable basis for denying the claim.
¶ 72. When Dr. Lee was finally deposed in June 2004, approximately three years after Thomas’s accident, the following colloquy occurred between him and Thomas’s attorney:
Attorney: Assuming that he has had these degenerative problems in his ■ back and has been able to go back to work and had hurt from time to time and has been off work- from time to time-assuming all that to bé true, how would you relate-that to the Juné 4 '01 incident that led up to the surgery?
Dr. Lee: Well, once again, certainly from looking at his history and what he described and what I’ve been told that he has said, he had problems with his back ¡fating back to 1991 with additional injuries in 2000.... Apparently, he was able to do his job and pick up some drinks. At some point his back went out. Something apparently happened to his back at the time. He is just more apt to have an injury to his back because-he has a bad back, so to speak. ,,
This medical assessment by.Dr. Lee. was crucial to the determination of whether Thomas had suffered a work-related injury.
¶ 73. Of particular interest is the fact that CNA knew that despite the information it had received from Coke — that the June 4, 2001 accident “[was] not a workers’] compensation] accident” — it needed to investigate further based on its policy guidelines.' And as far as I can tell from the record, it failed or refused to do so. That CNA was aware of the need to further investigate is shown by the following notation, entered in Thomas’s file by CNA on August 1, 2001:
Norma, Coke charges each location for claims they have which are compensable. I received an email from the branch in regard to1 this claim.-' The branch has stated that this is not a1 work comp accident, but I need to get the details from you. Was the auto accident a Coke accident that aggravated a preexisting injury ? Is this a compensable work comp - claim? Any detail you can give me will help. Even if you have questions at this pioint as to the validity, 1 can give'this information back to the branch manager.
(Emphasis added)..
' ¶ 74. Later in the same day when the above notation was entered in Thomas’s file, his case was referred to CNA employee Redferrin. It appears that Redferrin was directed to “make all contacts to determine . compensability for : all factors.” She was advised that, the injured worker, Thomas, “b.ent over to pick up an object and felt a pop in his back.” ■ Redferrin was directed to ascertain when the auto rollover accident occurred, as “[i]t appears that we have 2 different accidents.” She also was directed -to “[determine what is caused from this on .the jobs injury and what is from the van accident[J” And finally, she was instructed to determine “[w]hich [accident-Thomas was] losing time from[.]” . There is nothing in the record indicating that Referrin followed up as the file notation indicates she was instructed to do, for the next notation in-Thomas’s file is *692 the following notation, entered on August 24, 2001, by Redferrin:
Called insured and spoke with Willie MeadorQ] Willie advised this is not a workers compensation claim as employee had been in a serious vehicle accident and seriously injured his back. All medical bills have been made [sic] by his medical insurance. All doctors involved with the back injury reviewed all medical records and are all in agreement that [Willie]’s condition is not work-related but slightly aggravated by work. They reviewed the MRI report that was done previously and believe that all of his injuries are from the previous auto.accident and no new injury, [was] noted. The claim was set up as a matter of [r]eeord only. No payments [are] to be made. Employee had major back problems before this slight problem!,] and doctors all agree the problems are due to the auto accident and no work, comp injury. Employee is currently off work due to the auto accidént[J which is in no way related to this alleged claim. All doctors advised the complaints are not work related.
(Emphasis added). Clearly, as the above notation indicates, Redferrin conducted no independent investigation, choosing to talk only to Willie, Coke’s employee, and to accept his assessment of how the claim should be handled, as she concluded that “[t]he claim was- set up as a matter of record only.” American Casualty and CNA do not attempt to explain why no follow-up investigation was done to determine the accuracy of Willie’s assertion that Thomas’s injuries were not work related. This failure alone raises a genuine issue as to whether American Casualty and CNA can legitimately argue that they had an arguable basis for denying Thomas’s claim, unless they were contractually prohibited from investigating facts brought to their attention by Coke, a position that Coke denies.
¶ 75. American Casualty and CNA also rely on Thomas’s deposition wherein Thomas agreed that there was a legitimate dispute between him, Coke, and the insurance company. Clearly there was a dispute between Thomas, Coke, American Casualty, and CNA over the payment, of Thomas’s workers’ compensation claim stemming from the June 4, 2001 accident. However, acknowledging the existence of a legitimate dispute does not equate to acknowledging that an arguable basis existed for-,their denying the claim, which is the basis of Thomas’s bad-faith lawsuit. Further, according to the excerpts of Thomas’s deposition that were provided.in the record on appeal, Thomas was never asked if he believed American Casualty and Coke had an arguable, basis for denying his claim. Moreover, Thomas’s deposition was taken after he had filed his petition to controvert.
¶ 76. In Crenshaw, a case cited by Thomas, but admittedly not a workers’ compensation case, Crenshaw, the insured, suffered an injury to his right foot. The foot became much worse, progressively losing circulation and, eventually, requiring Amputation. Crenshaw, 483 So.2d at 257. When Crenshaw submitted a claim to his' accidental-injury carrier, Bankers Life & Casualty Company, Bankers' Life failed to conduct any investigation and, relying on three medical forms, which did not include all the information Banker’s Life normally required to make a coverage determination, Bankers Life denied the insured’s claim. Id. Crenshaw then sued. After reviewing the evidence, the trial court held that Bankers Life had acted in bad faith in denying the insurance claim, and our supreme court ¡affirmed. Id. at 277. '
*693 ¶77. The Crenshaw court, citing Peerless Insurance Co. v. Myers, 192 So.2d 437 (Miss.1966), affirmed that
recovery may be had where the accidental injury aggravates, renders active, or sets in motion a latent or dormant preexisting physical condition or disease, which in turn contributes to the disability or death for which recovery is sought, and where the accidental injury is a proximate cause of the resulting loss.
Crenshaw, 483 So.2d at 270.
' ¶ 78. Interestingly, in Crenshaw, the court also outlined the extensive investigative procedure set forth for a claim inquiry that Bankers Life failed to follow. As Coke argues in attempting to shift blame to American Casualty and CNA, it is undisputed that American Casualty and CNA did not follow the guidelines established in the “Special Handling Instructions.”

Is there a genuine issue of material fact as to Coke’s claim of an arguable basis for denying Thomas’s claim?

¶ 79. Coke argues that CNA conducted its own investigation and made its own determination to dispute the claim. Coke also submits that there was a legitimate and arguable basis to dispute Thomas’s claim, and even assuming Willie had-requested that CNA deny the claim, CNA should have independently .determined whether the claim was compensable. On this last point, I do not disagree with Coke’s position, but that is an argument for why CNA’s and American Casualty’s inactions should be scrutinized by a jury for a determination as to whether they acted in bad faith, not a shield for Coke in light of its action in providing patently false information to CNA and American Casualty.
¶ 80. Coke also points to the “Special Handling Instructions” section in the workers’ compensation policy with American Casualty and CNA, which explains how a claim involving a back injury should be handled. The “Special Handling Instructions” state, in pertinent part:
Workers’ Compensation
• Communication with the insured for the purpose of obtaining information and completing claim investigations should be coordinated with local Coca-Cola representatives..
• 24-hour Contact — Contact the local Coca-Cola contact representatiye and claimant within 24 hours of recqipt of claim is mandatory for:
Lost Time Injury Claims
All Back Claims
All Knee Claims
Heart Attack and Hearing Loss
Disability Expected to Exceed 21 Days or As Required by Coca-Cola Representative ,
• 48-Hour Contact with Treating Physician — Once it is determined that the Claimant’s disability will exceed the waiting period, 48 hour contact shall be made with the treating physician to determine the diagnosis, prognosis, restrictions and modified duty opportunities. Follow up with the doctor and rehabilitation nurse will take place every 30 days or earlier. Ongoing disability shall ’ be documented through monthly reports from the treating physician.
• All bills for the Coke account are to be sent to Corvel for bill review/repricing. Medical notes should accompany bills. Inpatient/Outpatient hospital bills should have medical notes, itemization of charges and admission/discharge summaries attached. Inpatient bills should reflect the IC file number.
• Under no circumstances will the carrier pay a non-compensable claim *694 without prior approval by Jim Woody.[6] Should such a. request [come] from local operations, immediately refer to Jim Woody. Request from lease agreements, contracts, cer-tifícate of insurance, etc. should be sent to Jim Woody.
• Basic investigation will bé completed within seven (7) days from the date of receipt of the claim and final investigation on the compensability issue completed within 14 days or earlier, as determined by state law.
• A preliminary plan of action must be clearly identified ■ and documented in the file within 14 days from receipt of the claim and updated every 30 days.
• Recorded statements will be taken from the claimant and witnesses within 48 hours of receipt of the claim or acknowledgment of existence of a witness for the following:
Questionable Cases
Occupational Disease
Cumulative Trauma
Back Injury
Head Injury
1181.' According to Coke, the only time where input was required directly from Coke with respect tq payment was with a “non-compensable claim.” Under the special-handling instructions, one bullet point states that “under no circumstance will the carrier pay a non-compensable claim without the approval by Jim Woody. Should such a request [come] from local operations, immediately refer it to Jim Woody.” According to Coke, even though CNA determined Thomas’s claim to be noncom-pensable, it never referred the issue to Jim Woody. Coke argues that since CNA did not believe the claim needed to be paid, Coke had no duty to do anything further. Coke lays responsibility with CNA and American Casualty to pay “promptly when due the benefits required of [Coke] by the workers’ compensation law” in accordance with Coke’s contract with American Casualty and CNA. As stated, Coke makes a great argument why American Casualty’s and CNA’s actions should be subjected to the crucible of jury deliberation for a determination as to whether they acted in bad faith. It may also be an argument for indemnification of any loss Coke may have suffered were this a case where Coke was suing American Casualty and CNA for their failure to investigate Thomas’s claim in accordance with the terms and conditions of, the contract between American Casualty, CNA, and Coke. But that is not the case.
¶ 82. In Mississippi Power & Light Co. v. Cook, 832 So.2d at 479 (¶ 9), the Mississippi Supreme Court set out the standard for a claim against an employer for damages for the refusal to pay compensation in bad faith. For a claimant to prevail, “there must be a determination as ■ to whether there was a legitimate or arguable reason to deny the benefits, and/or that the denial constituted a willful or malicious wrong in disregard for [the claimant’s] rights.” Id. (citations omitted). In Mississippi Power & Light Co., Cook, an employee of Mississippi Power and Light Co. (MP & L), received workers’ compensation benefits from MP & L and medical treatment after an on~the:job injury. Id. at 47$ (¶ 4). The doctors who treated Cook found that he had suffered a fifteen percent permanent impairment to his right shoulder. However, MP & L cut off Cook’s benefits completely. Id. Eventually, Cook and MP & L reached a settlement, but Cook reserved the right to bring a bad-faith claim against MP & L. Id. Thereafter, Cook filed a complaint against MP & L, asserting, *695 among other claims, that MP & L terminated his workers’ compensation benefits in bad faith. Id. After a trial, the jury returned a verdict in favor of Cook, awarding both actual and punitive' damages. Id. MP & L appealed to the Mississippi Supreme Court, arguing that there was no evidence “to show that MP & L ha[d] acted out of malice, with gross neglect or otherwise tortiously.” Id. at 480 (¶ 16). In affirming the jury’s verdict,[7] the Mississippi Supreme Court stated that “the denial of benefits does not have to be wi[l]lful or malicious[,] but there may not be an arguable basis to deny the claims.” Id. at 480-81 (¶ 16) (citing Miller v. McRae’s, Inc., 444 So.2d 868 (Miss.1984)).
¶ 83. Just as MP & L did in Cook, Coke initially accepted Thomas’s claim as com-pensable and paid certain medical expenses, but thereafter terminated the payments. Further, just as reliance upon a medical report was involved in Cook in the denial of benefits, reliance upon a medical report is involved here in Thomas’s denial of benefits. In Cook, the medical report provided that Cook had a fifteen percent permanent disability to his right arm.[8] In our case, the ORA report determined that Thomas’s present condition, though not a new injury, was the result of the aggravation of injuries that occurred in prior accidents, one of which was work related.
¶ 84. I find the existence of a genuine issue of material fact as to whether Coke had an arguable basis for refusing to pay compensation benefits to Thomas. This is so for two reasons. First, there is clear evidence that Coke had a substantial pecuniary interest to protect, because, according to the policy, the Laurel plant would be responsible for payment up to the first $250,000. Second, ORA’s report cannot be properly read to exclude coverage, even if the determination by the doctors — that the June 4, 2001 accident did not resuit in a new injury — is correct because our law has long been well settled that an on-the-job injury that aggravates a preexisting condition is compensable.
¶ 85. For the reasons presented, I dissent. I would reverse the summary judgment and remand this case for further proceedings.
LEE, C.J., AND JAMES, J., JOIN THIS OPINION. MAXWELL, J., JOINS THIS OPINION-IN PART.

. Presumably this is how CNA entered 'into the picture, as it is the "adjusting arm” charged with investigating, administering, and adjusting claims filed under the American Casualty insurance policy.

. The record does not shed further light on this status change. However, it appears that Thomas was recategorized from his regular salary to workers’ compensation benefits.

. The record reflects two other important entries that CNA made in Thomas’s file. I quote those two entries during my discussion of American Casualty and CNA’s argument that they possessed an arguable basis for denying Thomas’s claim. However, neither entry shows that Redferrin conducted an investigation.

. The parties to a claim may enter into a compromise settlement of a claim whether it is controverted or noncontroverted. ’ When the parties have entered into compromise settlement of a claim pending at the Commission, the parties must submit an agreed petition for approval of compromise settlement to the Commission.

. Neither Thomas nor the appellees differentiate between American Casualty and CNA in their role in this bad-faith action.

. A claims manager at Coke.

, The supreme court affirmed the award of compensatory damages in toto but affirmed the award of punitive damages on the condition that Cook accept a remittitur of $500,000, or a new trial on the issue of punitive damages was ordered. Cook, 832 So.2d at 487-88 (¶ 43).

. I note that there were several. claims at issue, in Cook that perhaps explain why MP & L denied benefits despite a medical report assessing a fifteen percent permanent disability- -